**JOHN B. STETSON CO. v. STEPHEN L. STETSON CO., Limited, et al.**

District Court, S. D. New York.
March 4, 1936.

Supplemental Opinion March 18, 1936.

Clarke & Allen, of New York City (Saul, Ewing, Remick & Saul [by Maurice B. Saul], Allen S. Olmsted, 2d, and Earl G. Harrison, all of Philadelphia, Pa., and Murray F. Johnson, of New York City, of counsel), for plaintiff.

Conboy, Hewitt, O'Brien & Boardman, of New York City (Martin Conboy and David Asch, both of New York City, of counsel), for defendant Stephen L. Stetson Co.

Gelman & Erde, of New York City (Louis I. Gelman and Joseph George Erde, both of New York City, of counsel), for defendant Hutt & Wasserman.

WOOLSEY, District Judge.

My decision in this cause is in favor of the plaintiff, which will have an interlocu-

tory decree against both defendants carrying costs and giving the relief hereinafter indicated in detail.

I. This cause has two branches: First, a claim of infringement of trade-mark by the defendant Stephen L. Stetson Company, Ltd., to which it is alleged that Hutt & Wasserman, Inc., contributed; and, second, a claim of unfair competition with the plaintiff on the part of both said defendants.

II. The subject-matter jurisdiction of this court herein is based, in so far as questions of trade-mark are concerned, on the Trade-Mark Act, § 17, as amended, title 15 United States Code, § 97 (15 U.S. C.A. § 97), and, in so far as questions of unfair competition are concerned, on the fact that the cause is brought by a corporation of the state of Pennsylvania against two corporations of the state of New York and involves an amount admittedly in excess of the statutory requirement.

III. The plaintiff is the maker of hats which have long been sold under the name "Stetson" hats. It claims as its trade-mark the word "Stetson" registered on May 1, 1906, under section 5 of the Act of February 20, 1905, as amended, title 15 United States Code, § 85 (15 U.S.C.A. § 85), as Trade-mark No. 51,990. It also claims that the word "Stetson" as a trade-name has acquired a secondary meaning as designating hats made by the plaintiff.

Defendants rely principally, by way of defense, on the claim that it is fairly using as its corporate title, and, as a mark in its hats and caps and in its advertising, the name of Stephen L. Stetson, its president, active executive officer, and principal stockholder, who is a grandnephew of the founder of the plaintiff's business, and that a corporation principally owned and controlled by him has a right to use his name as it has been used.

The plaintiff contends that using the name Stephen L. Stetson, which is not a registered trade-mark, infringes the plaintiff's trade-mark "Stetson" which is affixed to the plaintiff's hats, and that by participation in the manufacture of those hats the defendant Hutt & Wasserman, Inc., are contributory infringers of the plaintiff's said trade-mark.

Stephen L. Stetson contends that the words "Stephen L. Stetson" are not a simulation of the word "Stetson" used simpliciter and should not cause confusion,

and that as it is his own name he should be entitled to use it.

The other defendant, Hutt & Wasserman, Inc., contends that it cannot properly be held guilty of contributory infringement of this trade-mark or of unfair competition because, as it claims, all it does is to sell certain hat bodies to the defendant Stephen L. Stetson Company, Ltd., and lease to it certain facilities for the finishing thereof.

IV. The plaintiff's bill of complaint, filed January 10, 1934, asks for the injunctive relief against the defendants customary in a cause of this kind, and prays specially for (1) an injunction preventing the defendant Stephen L. Stetson Company, Ltd., from using the name "Stetson" in any form, on hats and caps, their linings or sweatbands, or on boxes containing them, (2) from acts of unfair competition by advertising or otherwise in the sale of hats and caps, and (3) a reference to ascertain the defendants' profits and the plaintiff's damages caused by the defendants' allegedly wrongful acts.

V. The facts in this cause, as to which there is not very much dispute, are as follows:

A. 1. The plaintiff John B. Stetson Company, which was incorporated in 1922, succeeded another corporation of the same name which had been formed on May 4, 1891. Both were corporations of Pennsylvania.

All the business, good will, trade-marks, and other property of the first John B. Stetson Company were transferred to the plaintiff at or about the time of its organization.

The corporation formed in 1891 under the name of John B. Stetson Company duly succeeded to the business commenced in Philadelphia about 1865 by John B. Stetson individually and carried on there from 1869 to 1874 as a partnership with John B. Stetson and Charles W. Stetson, one of his brothers, as partners.

The plaintiff John B. Stetson Company and its said predecessors in business have for seventy years been engaged at Philadelphia in the business of manufacturing and selling high-grade hats and other headgear and the products of the successive Stetson businesses have been and now are distributed in all parts of the United States and throughout a large part of the world.

John B. Stetson was the president of the plaintiff's predecessor corporation from the time of its organization in 1891 until his death in 1906.

2. On May 1, 1906, under the Trade-Mark Act of 1905, § 5, now title 15 United States Code, § 85 (15 U.S.C.A. § 85), the name "Stetson" was duly registered in the United States Patent Office under No. 51,-990, by the plaintiff's predecessor corporation as a trade-mark for hats and caps. This registration was duly renewed on April 30, 1926, for a further period of twenty years from May 1, 1926.

3. The plaintiff's predecessors have used the said trade-mark "Stetson" in their businesses for about seventy years, and it was their practice to affix the said trade-mark to their hats by printing or stamping it—sometimes with additions immaterial here—upon the lining, labels, and hat leathers which were attached to the inside of the hats and caps made by them, and also to have it prominently appear on boxes and other receptacles in which the hats were packed for shipment to retailers, and upon the shipping cases in which such boxes and receptacles were shipped.

Since the registration of the said trade-mark "Stetson" on May 1, 1906, the plaintiff and its predecessor corporation have not abandoned it, but are now using it—sometimes with additions immaterial here—on the hats and caps made by them, and since then it has been the practice of the plaintiff and its predecessors to affix the said trade-mark—sometimes with additions immaterial here—to its products by printing or stamping it upon the hat linings and sweatband leathers which are attached to the inside of hats and other headgear of their manufacture, and also to have it appear prominently on boxes or other receptacles in which their hats are packed.

4. The plaintiff and its predecessors have, since at least January 1, 1866, been continuously engaged in the sale and distribution of high-grade headgear in connection with which they have used the name "Stetson" and have since the incorporation of the first John B. Stetson Company in 1891 spent approximately $5,600,-000 in advertising. Of this amount about $4,400,000 has been spent during the last fifteen years in world-wide advertising—through newspapers, magazines, radio, on hoardings, and by other advertising media—of hats manufactured and sold by them as "Stetson Hats."

5. Due to the excellence of its product and this extensive advertising the plaintiff and its predecessor corporation have sold in the United States and foreign countries, in the period between the incorporation of the first John B. Stetson Company in 1891 and October 31, 1935, 7,422,522 dozen hats of their manufacture having an invoice value in excess of $340,000,000. Not less than 85 per cent. of these hats have borne the name "Stetson."

6. For at least fifty years, to the hat trade and to the hat purchasing public in the United States and in many foreign countries, the name "Stetson" has identified only the hats manufactured by the plaintiff and its predecessors in business, and the name has come to have great value because it is associated in the mind of the hat purchasing public with products of excellent material and style.

7. In 1930 the plaintiff began to advertise its products as *"Style Leaders for Three Generations."*

8. Stetson as a trade-name or brand name is one of the best known, if not the best known, in the hat trade of the world.

B. 1. The business of manufacturing and selling hats by a member of the Stetson family was first commenced at Orange, N. J.—then and for long afterwards one of the chief hat manufacuring centers in the United States—in the early part of the nineteenth century by Stephen Stetson, the greatgrandfather of Stephen L. Stetson, president of defendant Stephen L. Stetson Company, Ltd. The first Stephen Stetson was succeeded in business by his sons, Henry (granduncle of Stephen L. Stetson) and Napoleon (grandfather of Stephen L. Stetson). This business had been conducted in Orange, N. J., under the name of an individual Stetson or of Stetson & Company for many years before John B. Stetson, who was a younger son of Stephen Stetson, commenced business in 1865, under his own name, in Philadelphia, Pa.

2. After 1865, when John B. Stetson commenced his business under his own name in Philadelphia, the manufacture and sale of hats under various Stetson names was continued in Orange, N. J., where it originated.

3. During the year 1878, and the succeeding years, to December 28, 1883, the business—founded at Orange, N. J., by Stephen Stetson, and thereafter carried on

by his sons Henry and Napoleon, in partnership with each other, and, after Henry's death in 1853, by Napoleon Stetson alone—was still in existence and was then carried on under the names of Stetson, Smith & Co., and later Stetson & Co. During part of that time, at least, Napoleon Stetson was active in such business. John B. Stetson also participated therein. Napoleon Stetson was regarded as the head of the Orange business.

4. On December 28, 1883, the No Name Hat Manufacturing Company was incorporated under New Jersey law—its somewhat awkward name being chosen at the instance of John B. Stetson to avoid use of the Stetson name elsewhere than in his Philadelphia business—and continued thereafter in Orange, N. J., the business previously carried on as Stetson & Co. John B. Stetson at first was the president of the No Name Hat Manufacturing Company. Then he held 800 of the 1,500 shares authorized, and his son-in-law, Henry H. Roelof, his nephew, Charles R. Wilmot, and an associate in his Philadelphia business, William F. Fray, each held 100 shares. On September 10, 1891, John B. Stetson owned 1,150 shares of the said Company, Charles R. Wilmot, his nephew, 250 shares, and William F. Fray, 100 shares.

5. Prior to 1878, Henry Stetson, nephew of the first Henry Stetson, and father of Stephen L. Stetson, entered the employ of Stetson, Smith & Co., or its predecessor, as a young man, and at no time had any other trade or occupation than manufacturing and selling hats.

6. Henry Stetson, father of Stephen L. Stetson, continued in the employ of Stetson, Smith & Co. and Stetson & Co. successively, and, after 1883, with the No Name Hat Manufacturing Company until about 1889, when, with one Frederick Grundman, he formed a partnership known as Stetson & Co. which began to manufacture hats using the name "Stetson."

7. John B. Stetson then commenced several suits against dealers to whom Stetson & Company had sold hats to restrain the use of the name "Stetson." These suits were compromised. In effecting a compromise of these causes, a contract was signed in 1891 between Henry Stetson and the No Name Hat Manufacturing Company by which Henry Stetson was to receive from the No Name Hat Manufacturing Company for a period of ten years $30 a week as an employee of the No Name Hat Manufacturing Company and was to receive by assignment from John B. Stetson 200 shares of the stock of said company of the par value of $50 each, amounting in all to $10,000.

8. At that time the capitalization of the company was increased from $75,000 to $100,000, and Henry Stetson became a director of the company, together with John B. Stetson, Charles R. Wilmot, William F. Fray, and the Frederick Grundman above mentioned.

9. In the year 1893, John B. Stetson, who then had control of the No Name Hat Manufacturing Company, contracted to sell his stock therein and retired as the president and a director of the corporation. He was succeeded as president by Henry Stetson, Stephen L. Stetson's father, and Henry Stetson continued as president until his death in 1906.

10. From 1891 to the time of his death, Henry Stetson did not manufacture or sell hats bearing the trademark "Stetson," or, indeed, bearing his name or the name Stetson, unless on some hats his name may have been stamped on the sweatband as president of the No Name Hat Manufacturing Company, whose hats were known as the "No Name."

11. Stephen L. Stetson was born in Orange, N. J., in 1886. He is the son of Henry Stetson, nephew of John B. Stetson, and president of defendant Stephen L. Stetson Company, Ltd.; the grandson of Napoleon Stetson (brother of John B. Stetson), and the greatgrandson of the first Stephen Stetson (father of John B. Stetson), all of whom were in the hat business, and none of whom was connected with the plaintiff's business or its predecessors.

12. The first Stephen Stetson went out of business before John B. Stetson started his hat business at Philadelphia in 1865; Napoleon Stetson ceased using the name "Stetson" in his business in 1883; Henry Stetson ceased using the name "Stetson" in his business in 1891; and Stephen L. Stetson never used the name "Stetson" in business until 1931.

13. The "Tradition" (hereinafter mentioned as part of the defendant's advertising) of Stephen L. Stetson and his direct ancestors in the hat business had for forty years before 1931 been connected only with the brand "No Name:"

14. Stephen L. Stetson is not, and never has been, employed by the plaintiff or by any of its predecessors. Prior to 1931 he had never been engaged in any business bearing his own name or in any business which bore the name "Stetson," or which manufactured or sold hats bearing the name "Stetson."

15. In 1903, at the age of seventeen, he was employed by the No Name Hat Manufacturing Company, of Orange, N. J., of which his father Henry Stetson was then president and a stockholder. He was continuously employed by the No Name Hat Manufacturing Company in various minor positions from 1903 to 1926, at which time that corporation ceased to do business and was liquidated most successfully, paying its stockholders $450 for each $100 which had been invested in it. At the time of the liquidation he was receiving a salary of $50 per week.

16. From 1926 to 1931, he was a vice president of the No Name Hat Company, a Connecticut corporation, formed after the liquidation of the New Jersey corporation, and during that period did some work for it occasionally as a traveling salesman.

17. From the spring of 1931 to May 1, 1933, Stephen L. Stetson, individually, carried on the business of selling hats labeled in the lining and the sweatband thereof with the name "Stephen L. Stetson." The hat boxes in which the hats were packed and sold were labeled "Stephen L. Stetson"; and the hats so sold by Stephen L. Stetson were advertised by him as "Stephen L. Stetson" hats.

18. The defendant Stephen L. Stetson Company, Ltd., was incorporated in 1933 with an authorized capital of $25,000, and succeeded to the business which Stephen L. Stetson had been conducting individually since the spring of 1931.

19. Of the paid-in capital of $8,000, $2,000 was paid by one John J. Booth for stock which is still owned and held by him; and $6,000 was paid by Stephen L. Stetson ($2,000 in cash and goods valued by the incorporators at $4,000), for which he received stock still owned and held by him.

20. Stephen L. Stetson is the president and treasurer of the defendant Stephen L. Stetson Company, Ltd., and John J. Booth, above referred to, is vice president and secretary thereof.

21. John J. Booth entered the employ of Stetson, Smith & Co. at the age of thirteen in the year 1878. He has had no trade or occupation other than the manufacture and sale of hats. He was afterwards associated with Stephen L. Stetson's father, Henry Stetson, as an employee in the No Name Hat Manufacturing Company, of New Jersey, and when Henry Stetson died Booth became production manager thereof. Thereafter he was a co-employee of that company with Stephen L. Stetson.

22. Booth continued with the No Name Hat Manufacturing Company, of New Jersey, throughout its existence. When it was liquidated in 1926, he purchased for $1,500 its good will, its trade-names and trade-marks, inter alia the trade-marks "No Name," "Vanity," and "Olympic," together with various dies, blocks, etc., then owned by and in the custody of the company; and in the contract with Booth, whereby this transfer was accomplished, it was also agreed inter alia that Booth could create and organize a corporation under the laws of the state of Connecticut with the name the "No Name Hat Company" and could use the words "No Name" in any style or title except that of the New Jersey corporation, namely, "No Name Hat Manufacturing Company."

23. After the No Name Hat Company was organized by Booth under the laws of Connecticut, Booth became president thereof and Stephen L. Stetson became vice president, and during the period from 1926 to 1931, when he went into business for himself, he occasionally did some work for the No Name Hat Company as a traveling salesman and he still remains vice president thereof.

The principal offices of the No Name Hat Company, of Connecticut, are now located in New York in the office of Hutt & Wasserman, Inc., whither it went in the fall of 1930 or the spring of 1931. It does not appear exactly what connection there is between No Name Hat Company, of Connecticut, and Hutt & Wasserman.

The "No Name Hats" are manufactured by Hutt & Wasserman, Inc., and the No Name Hat Company is the selling agent of the "No Name Hats." Its offices with Hutt & Wasserman, Inc., are separate from the offices of Stephen L. Stetson Company, Ltd.

24. The defendant Stephen L. Stetson Company, Ltd., may fairly be described as

a skeleton organization. Its only employees are Mr. Stephen L. Stetson, Mr. Booth, who has been referred to above, and Mr. Stephen L. Stetson's son whose name is Stephen Henry Stetson. It has not any other regular employees. Mr. Stephen L. Stetson attends to the books of account of first entry himself and an accountant comes in each week to write up his books of account for him.

25. The office of Stephen L. Stetson Company, Ltd., is at 584 Broadway, in the same loft with the defendant Hutt & Wasserman, Inc., yet some of the advertising put out gives the address as 580 Broadway, though the entrance is at 584. Its showroom occupies in that loft a floor space of about 20x30 feet, and Stephen L. Stetson has a private office of about 15x20 feet wherein he and Mr. Booth have a double desk together. His son works in the factory outside.

The defendant Stephen L. Stetson Company, Ltd., does not manufacture its hat bodies. It buys about 70 per cent. of them from the defendant Hutt & Wasserman, Inc., and the remainder from other manufacturers. It also buys from Hutt & Wasserman, Inc., its hat bands for the outside of the hats and its leather sweatbands and linings. The labels on the inside of the linings and on the sweatbands are stamped on them by the firm of Beatty & Page, Inc., from whom it buys the dies for the stamp and the expense of the stamping is billed direct to the defendant Stephen L. Stetson Company, Ltd.

26. The relationship between the two defendants is covered by a written agreement, dated June 1, 1933:

"Agreement made and dated this First day of June, 1933 by and between Hutt & Wasserman, Inc. hereinafter designated as the first party and Stephen L. Stetson Co. Ltd. hereinafter designated as the second party.

"Whereas, the first party maintains Offices and factory for the manufacture of mens hats at 580–584 Broadway in the Borough of Manhattan New York City and

"Whereas, the first party hereby represents that it has facilities for the manufacture of fifty dozen hats per day over and above its own requirements and

"Whereas, the second party is desirous of engaging facilities for the manufacture of hats.

"Now, in consideration of the premises, and in consideration of One Dollar in hand paid by each of the parties to the other, receipt of which is hereby acknowledged.

"It is hereby agreed as follows:

"1. The first party hereby lets and the second party hereby hires the facilities of the first party at #580–584 Broadway, New York City for the manufacture of not more than fifty dozen hats per day—together with sufficient space as the second party may require for office purpose and for stock room.

"2. In consideration therefore the second party agrees to pay to the first party a sum equal to ten percent of the invoice prices of all hats so manufactured.

"It being understood and agreed that said charge of ten percent shall entitle the second party to the use of all weekly factory help of the first party. The term weekly factory help shall be defined as all factory help who do not work on piece work basis.

"3. It is further agreed that the second party may avail itself of the piece work labor employed by the first party in the manufacture of hats, in which event the second party is to pay such labor direct on actual cost bases, and the first party is to render a charge therefor to the second party.

"4. The item of ten percent mentioned in paragraph two herein shall become due and payable immediately upon rendition of invoices, and all labor charges shall become due and payable each and every week.

"5. That so long as the capacity of the second party for production shall not exceed fifty dozen hats per day, and during the existence of this agreement the second party hereby agrees that it will not engage any facilities for manufacture other than those engaged herein.

"6. The duration of this agreement shall be for a period of five years from date hereof, or until terminated by mutual consent; and shall be renewed for a further term of five years unless either party serves notice in writing upon the other twelve months before the expiration hereof, such notice to be given by registered mail.

"In witness whereof the parties have hereunto set their seals the day and year first above mentioned."

27. The piece workers who work on the finishing of the hats are employed by Hutt & Wasserman, Inc., and the expense of this piece work is reimbursed to Hutt & Wasserman, Inc., by Stephen L. Stetson Company, Ltd., on bills rendered weekly at whatever price the prevailing rate for piece work may be.

28. The 10 per cent. of the invoice price charged under the second paragraph of the above contract covers compensation to Hutt & Wasserman, Inc., for office facilities, showroom facilities, and miscellaneous factory and office help, including stenographers, employed by Hutt & Wasserman, Inc., in the manufacture of the hats of Stephen L. Stetson Company, Ltd., and their sale.

29. Hutt & Wasserman, Inc., however, has no proprietary interest in Stephen L. Stetson Company, Ltd., or, except as here indicated, in its profits or losses, and does not take any part in the printing of labels on linings, leather bands, or boxes or in the advertising of Stephen L. Stetson Company, Ltd.

30. The salesmen of Hutt & Wasserman, Inc., employed by them to sell their hats to retailers, are also used by Stephen L. Stetson Company, Ltd., who pays them direct on a commission basis for such sales as they make in its behalf.

31. At all times since the organization of the defendant Stephen L. Stetson Company, Ltd., on May 1, 1933, said defendant has carried on the business of selling hats labeled in the linings and the sweatbands thereof "Stephen L. Stetson"; the hat boxes in which the hats have been packed and sold were labeled "Stephen L. Stetson"; and the hats so sold by the defendant are advertised as "Stephen L. Stetson Hats" and "Hats by Stephen L. Stetson."

32. The experiences and contacts of Stephen L. Stetson, the president of said defendant, were not such as to invest his *own name* with value in the hat trade as a name for identification of hats, because it had never been in any way connected with the manufacture or distribution of hats until 1931, when he went into business for himself under his own name.

33. The only commercial value in the hat trade of the name Stephen L. Stetson in a hat arises from the fact that his last name is Stetson and from the consequent likelihood that its use would lead some purchasers to confuse the product, with which it was ostensibly identified, with the plaintiff's product, known for years under the name "Stetson" hats.

34. The customers of the defendant Stephen L. Stetson Company, Ltd. (of which there are now about 600), are retail shops. These retail shops, of course, sell direct to the buyers of hats.

C. 1. When the Stephen L. Stetson Company, Ltd., first went into business, it did not endeavor to differentiate itself from the plaintiff in the public mind by a clear and definite announcement that it was a new, different, and independent concern, as any company desiring honestly to build up its own good will would have done. Instead, it decided to follow a course of advertising which can fairly be described as equivocal, and in which, though some statements were technically true, the whole story was not told to the hat retailers or to the public, and, which, as a result, tended to inspire false representations by the retailers and their clerks, or at least gave countenance thereto.

2. The said advertising took two forms directly traceable to the defendant Stephen L. Stetson Company, Ltd.—

(a) Advertisements introduced by it into the hat trade papers read by the hat retailers who are customers of the hat manufacturers such as said defendant.

(b) Signs sent by it to retailers, who had become its customers, to be displayed by them in their shops.

3. As a result of this equivocal advertising, I find that it was not made clear that the status of the Stephen L. Stetson Company, Ltd., was that of a newcomer in the hat trade entirely distinct from the plaintiff, and that, consequently, on several occasions the products of the said defendant, marketed under the name "Stephen L. Stetson," have been confused with the plaintiff's product marketed under the name "Stetson," by the hat purchasing public, and on at least one occasion by a retailer.

4. The confusion on the part of the public between the plaintiff's product and that of the defendants has been caused principally by the following factors, in respect of which I comment en passant thus:

(a) By the presence of the name "Stetson" prefixed only by the Christian name and initial "Stephen L." on the hats themselves, when plaintiff's hats have long been known as "Stetson" hats.

(b) By the fact that about April, 1933, the defendant Stephen L. Stetson Compa-

ny, Ltd., caused to be inserted in trade papers an advertisement reading as follows:

"Stephen L. Stetson Hats

"In presenting hats of incomparable values to retail at $3.50 and $5.00,

"Stephen L. Stetson calls particular attention to the fact that he has no connection with any other concern of similar name. While he is proud of three generations of hat manufacturers that precede him, namely, his father, Henry Stetson—his grandfather, Napoleon—and the First hatter in the Stetson family, his great-grandfather, Stephen Stetson (established 1810), the present Stephen L. Stetson requests that his product be considered wholly upon its own merits and respectfully insists that these hats be advertised and sold as Stephen L. Stetson hats. Misrepresentation will not be tolerated.

"References for historical facts in this advertisement: Pierson's History of the Oranges, Vol. 2, p. 226 Whittimore's History of the Oranges, p. 263

"Stephen L. Stetson

"580 Broadway * * * New York"

This advertisement is misleading because it implies that the business conducted by the defendant Stephen L. Stetson Company, Ltd., is the same business as that conducted by Henry Stetson, Napoleon Stetson, and Stephen Stetson, which it is not, and because by stressing the alleged tradition of Stephen L. Stetson in the hat business it was, like the "Tradition" sign just to be mentioned, calculated to mislead prospective purchasers into believing that these hats were the product of a very old business conducted by the plaintiff, and because it was further calculated to call the attention of dealers, retailers, and others in the hat trade to the possibility of passing Stephen L. Stetson hats off as the product of the plaintiff and of taking advantage of the purchasing public's possible failure to discriminate between the defendant's product and the plaintiff's product, which said public had for years known as "Stetson" hats.

(c) By pasting within the sweatband of defendant's hat, on the left side, projecting above the hat band, between an inch and a half and two inches, the following paper label:

"Certified

"We certify that this hat is made of high grade, genuine fur felt, by skilled union labor in accordance with our long tradition in the art of hatting—dating back for three generations. This hat will give good wear and retain its style lines against normal usage.

"Stephen L. Stetson, Pres."

With regard to this label, it is to be observed:

1. That in 1930 the plaintiff had, as above noted, adopted as one of its so-called "advertising slogans," the phrase: "Style Leaders for Three Generations."

2. That this label is signed "Stephen L. Stetson, Pres.," without stating the name of the company of which Stephen L. Stetson is the president. And

3. That this label is almost exactly the same size and is printed in type of almost the same size, and on first sight gives the same impression to the eye, as does a paper label which is pasted by the plaintiff within the sweatband of many of its hats, on the right side, which projects about an inch and a half above the sweatband and of which the purpose is to notify the public that the "Stetson Re-Enforced Edge" is patented under United States Patent No. 1,848,832.

(d) By furnishing, commencing November, 1933, to retail dealers, who gave an order for hats, a sign to display in their windows and within their shops, which was admittedly drawn up in collaboration with counsel, and which reads as follows:

"Tradition

"Stephen L. Stetson in appointing this establishment as an accredited agency, respectfully calls the public's attention to his long tradition in the art of hatting.

"He is proud of the three generations of hat manufacturers that preceded him, namely, his father, Henry Stetson * * * his grandfather Napoleon Stetson * * * and the first hatter in the Stetson family, his great-grandfather Stephen Stetson, who established a manufactory at Orange, N. J. in the year 1810 A. D.

"Particular attention is called to the fact that these hats are independently made and sold on their own merits."

This "Tradition" sign tends to confuse rather than keep separate in the mind of the buying public the fact that the hat sold under the name "Stephen L. Stetson" is of a different make from that sold by the plaintiff which is commonly referred to as a "Stetson" simpliciter, especially in view of the plaintiff's advertising slogan for its

82

products, begun in 1930, "Style Leaders for Three Generations."

■ (e) Whilst acts of misrepresentation by dealers are not wholly controllable by a manufacturer, it is important to consider them in any cause involving a claim of unfair competition—

First, because it is partly due to such misrepresentation that the goods of the defendants are passed off as plaintiff's goods; for it is at this point in any merchandising that the purchasing public enters the scene. And

Second—perhaps more important—because, if widespread, they are symptomatic of the structural elements which the defendant has infused into the situation, and the opportunity which such elements afford and the countenance which they give to such misrepresentations.

There were several instances of misrepresentation by dealers testified to at the trial, and there have been put in evidence a number of depositions and stipulations as to the testimony of witnesses on such misrepresentations.

They show instances of almost nationwide misrepresentation by dealer customers of the defendant Stephen L. Stetson Company, Ltd., many of which stem back to its advertising, and some of which were successfully maintained on the part of the dealers by reference to the "Tradition" sign which was always at hand in their shops to confirm their statements.

Briefly summarized, the various forms of such misrepresentations may be thus described:

Some shops used the name "Stetson" without using the words "Stephen L."

Some shops, without authority, subordinated the words "Stephen L." in their advertisements to the word "Stetson" by printing "Stephen L." in smaller type.

All shops had the "Tradition" sign and almost all exhibited it.

Some retailers quoted or paraphrased the "Tradition" sign in their advertisements.

Some retailers say that "the name 'Stetson' speaks for itself and is based on three generations of hat stylists and manufacturers." This obviously is based on the "Tradition" sign.

In a few shops the words "Stephen L." have been so placed as to be covered by gloves or shadows allowing the "Stetson" only to show clearly

In one shop the dealer told a customer who bought a Stephen L. Stetson that he was getting a "Stetson" hat.

In some shops the representation was made that a Stephen L. Stetson hat was one kind of a "Genuine Stetson Hat."

Some dealers stated that both hats were made in the same factory.

Some dealers said that Stephen L. Stetson and John B. Stetson were brothers and were still working in partnership; and

Some dealers said that Stephen L. Stetson was a brother who had broken away from the original firm.

In several shops the dealers gave customers defendant's hats when they asked for "Stetson" hats.

There were three instances of palming off in which customers, familiar with plaintiff's hats, were persuaded that the defendant's hats were of plaintiff's make.

5. The defendant Stephen L. Stetson Company, Ltd., has made some effort to avoid such confusion by instructing salesmen and retailers to refer to and advertise the product always as Stephen L. Stetson hats only, never as "Stetson" hats; but there is not any proof that its salesmen and retailers have had any general instructions —written or oral—to explain that there are now *two* Stetsons in the hat trade or that before effecting sales of Stephen L. Stetson hats they should ascertain whether the purchaser has in mind the plaintiff's product and understands that it is not the same as that of the defendant.

6. And I think it can fairly be said that the defendant Stephen L. Stetson Company, Ltd., instead of being careful to differentiate itself from the plaintiff and independently build up its own good will, was careful not to do so. This is perhaps well illustrated by the incident of Bob's Mens Store:

Bob's Mens Store, a retailer in Chicago, represented the defendant's hats as "Stetson Hats." The plaintiff brought suit to enjoin it from doing so. The defendant aided the said Bob's Mens Store in this suit by agreeing to send him evidence and by agreeing to pay the costs of the litigation in case the defendant was successful. Such action on the part of the defendant certainly went beyond the honest use of his own name in business in that it aided and abetted a retailer who had misrepresented the defendant's hats from being enjoined from such misrepresentation

This incident was,. of course, brought pointedly to the attention of the defendant Stephen L. Stetson Company, Ltd., by the plaintiff, and it is true that when Bob's Mens Store lost its case in the Illinois courts the said defendant refused to sell further to it, or to any one who sold directly to it. This attitude was, of course, to the defendant's credit, though one cannot tell whether or not it was assumed because of the publicity which had been accorded to the misrepresentation in question or because of a real desire on the said defendant's part to prevent any unfair competition.

7. Later events, however, seem to cast a somewhat unflattering light on this incident; for in February 1934, after this suit was begun, the defendant, Stephen L. Stetson Company, Ltd., caused to be inserted in a trade paper an advertisement which consists of a photographic reproduction of an article in a garment trade daily paper purporting to describe the answer filed by said defendant in this suit without quoting it.

This article was inaccurate and was known, or should have been known, to the defendant Stephen L. Stetson Company, Ltd., to be inaccurate, and it was improper to publish an inaccurate article about the pleadings herein whilst this suit was pending. As above noted, certain statements made by retailers to purchasers of hats referring to a lawsuit and an alleged right in the defendant to use the name of "Stetson," appear to be based upon this advertisement or upon similar statements emanating from the defendant.

The defendant failed to co-operate with the plaintiff in correcting the mistake aforesaid for when the garment trade paper referred to corrected its error, and the plaintiff called upon the defendant to publish a retraction of its advertisement, the defendant, after delaying any answer at all to such request for some months, ultimately refused to print such a retraction.

8. In 1934, the defendant Stephen L. Stetson Company, Ltd., employed one Paul Nye, of Lincoln, Neb., who had been a salesman for the plaintiff's midwestern territory from 1915 to 1925, as its own salesman in the said territory. The said Paul Nye sold hats to purchasers who had had accounts with the plaintiff company, and to others, in some cases by means of a telephone conversation, without an exhibition of samples and upon the representation, among others, that the hat would carry the label "Stephen L. Stetson." One retailer, the Graff Clothing Company, of Seward, Neb., which had thus bought the hats without seeing them, after receiving the hats and the advertising matter with which the defendant inevitably followed up a new account, advertised them in a local paper reproducing the defendant's "Tradition" advertisement, with the addition of the caption, "It's a Stetson."

9. Summarizing the situation:

The defendant Stephen L. Stetson Company, Ltd., has failed in its published advertisements to use reasonable and practicable means to prevent the confusion between its goods and those of the plaintiff.

It has omitted to give general written instructions to its trade or warn them not to sell the hats as "Stetson" hats.

It has failed to give even oral instructions that its dealers should make sure that their customers understood that there were two hats on the market bearing the name "Stetson" and that the plaintiff's hat was the old "Stetson Hat" and that the defendant's hat was a newcomer in the field.

The said defendant has condoned the dissemination of information which induced retailers to believe that they had the right to represent the defendant's hats as made by a person or company, once a part of but no longer connected with the plaintiff or its predecessors, but because of such past connection with the plaintiff or its predecessors possessed of the knowledge or skill in hat making associated in the public mind with the name "Stetson."

10. The defendant Hutt & Wasserman, Inc., has knowingly taken part in and promoted the acts of the defendant Stephen L. Stetson Company, Ltd., as above found by finishing the hats sold by the defendant Stephen L. Stetson Company, Ltd., pursuant to the contract above set forth in extenso, with labels, linings, and sweatbands which are subject to the criticism noted above, and by knowingly furnishing the use of its office force to the business purposes of the defendant Stephen L. Stetson Company, Ltd., under said contract.

D. That in June, 1931, almost immediately after the appearance of defendant's hats on the market the plaintiff notified both defendants to discontinue the use of the name "Stetson" in any form in the hats which were being manufactured and marketed by them, but that each defendant declined to comply with that notice.

**VI.** My conclusions of law on the foregoing facts and my comment thereon is as follows:

█ 1. The registration by the plaintiff of the surname "Stetson" as a trade-mark did not exclude other persons named Stetson from going into the hat business under their own names provided they did not use such names in a misleading manner on their goods. Cf. Thaddeus Davids Co. v. Davids Mfg. Co., 233 U.S. 461, 470, 471, 34 S.Ct. 648, 58 L.Ed. 1046, Ann.Cas. 1915B, 322.

█ I do not think that the words "Stephen L. Stetson" as used in the linings, sweatbands, labels of hats, and on the hat boxes sold by the defendant Stephen L. Stetson Company, Ltd., is an infringement of the plaintiff's trademark "Stetson,"

First, because I do not think the words "Stephen L. Stetson" sound to the ear so nearly like the word "Stetson" as to constitute an infringement of that trade-mark on the basis of idem sonans, and

Second, because the arrangement of the name "Stephen L. Stetson" in the interior of the defendant's hats—whether on lining, label, or sweatband—is not similar to the arrangement by the plaintiff of its trademark "Stetson" on its hats.

I, therefore, find that there is not any technical infringement by the defendants of the trade-mark "Stetson" in this cause.

The procedure of the defendant Stephen L. Stetson Company, Ltd., has been far more subtle. It has sought by use of Stephen L. Stetson's name in connection with guileful advertising to accomplish what it knew would be stopped if attempted by direct means.

2. In the well-tilled and tempting commercial field which the plaintiff had cultivated, the defendant Stephen L. Stetson Company, Ltd., claims in effect that, although it is a newcomer in the hat trade, because its president's true name is Stephen L. Stetson, it may as a matter of law reap where it has not sown, providing it does not *affirmatively* attempt to pass off its goods as the plaintiff's goods.

That is not, as I understand it, the principle applied in cases of unfair competition which involve conflict between identic patronymics when the first in the trade has acquired a secondary meaning.

█ In Coty, Inc. v. Parfums de Grand Luxe, Inc., et al., 298 F. 865, the Circuit Court of Appeals for this Circuit laid down the rules which control newcomers in such cases. The court said at page 875 of 298 F.:

"While one cannot be denied the legitimate use of his name in carrying on his business, he cannot do so in a manner which invades the rights of others. And the courts have held that:

"(1) He may not affirmatively do anything to cause the public to believe that his article is made by the first manufacturer.

"(2) He must exercise reasonable care to prevent the public from so believing.

"(3) He must exercise reasonable care to prevent the public from believing that he is the successor in business of the first manufacturer."

I hold that the defendant Stephen L. Stetson Company, Ltd., has not conformed to the last two of these rules.

Notice should be taken in this connection also of the remarks made in John Brinsmead & Sons, Ltd., v. E. G. S. Brinsmead (1913) 30 Reports of Patent Cases 493, by Lord Justice Buckley, of the English Court of Appeal, who was one of the greatest chancery judges of the past generation and who afterwards went to the House of Lords as Lord Wrenbury and died only a few months since. He was dealing with the question which we have here as to the duty devolving on a newcomer who goes into a trade in which his own patronymic has already achieved a secondary meaning as indicating the product of another, and he said, 30 Reports of Patent Cases, at page 508: "I will read an early passage from the judgment of Lord Justice Collins in the Valentine's Meat Juice Case. I agree he goes on later in his judgment to add elements which I may exclude, but the earlier passage in his judgment is this:—'His main defence'— that is the defendant's main defence— 'was, that so long as he used his own name, which was the real source of the deception, his deception, his position could not be impugned.' Now from that I absolutely dissent for you introduce into it that which has been found as a fact in this case, and which was proved perhaps more clearly by Mr. Upjohn's own witnesses than by anybody else, namely that the name which does form the basis of the deception has acquired a secondary significance and means only, in the markets where this product is sold, the juice or extract manu-

factured by the plaintiffs. It is immaterial whether the deception arises from the use of a name which is, as it happens, the name of the defendant, or whether it arises from the use of any other description, which in a sense may be accurate, of that which he sells, for if the article which he sells has come to be known in the market as meaning something made by somebody other than himself, it is impossible for him to sell it simpliciter by that name although it be his own, without misleading purchasers. * * * The defendant then may not even use his own name without taking care to say:—'Mark you, I am not the plaintiff.' That, I think, is the law which we have to apply."

It is true that he voted to affirm the decision of the court below in favor of the defendant, but the affirmance was solely on the ground that the plaintiff's case had failed for want of proof.

Lord Justice Buckley's statement, it seems to me, is peculiarly applicable in the present case. It sounds in common sense, and lays down a proposition which, so far as I have been able to find, is not contravened in any way by the many authorities which have been called to my attention by the diligence of counsel herein and all of which I have carefully read.

3. Stephen L. Stetson's life may be thus briefly summarized:

After being a clerk in the No Name Hat Manufacturing Company, of New Jersey, for upwards of a quarter of a century, and then having been somewhat casually connected for five years, during an ad interim period of semi-retirement, with the No Name Hat Company, of Connecticut, and without, so far as is shown, himself having a scintilla of good will in the hat business, he decided in 1931 to throw off his anonymity and go into the hat business under his Stetson name.

It was then incumbent on him, I hold, to have made it clear beyond any doubt that he was going into the hat business as an independent hat manufacturer who was a newcomer, and was going to build up his own good will and was not by the use of his patronymic to start a process of erosion on the good will which the plaintiff and his predecessors in the Stetson hat business in Philadelphia had built up over a long period of years.

I think it is clear beyond peradventure that the reason why Stephen L. Stetson decided to use his own name in the hat business—or took the suggestion of some one else that he do so, whichever may be the fact—was because the name Stetson had become about the best known hat name in the world due to the excellence of the goods produced by the plaintiff and its predecessors and the money which they had spent in advertising.

If Stephen L. Stetson himself had wished to build up his own good will and depend on that only for success, or if he had been well advised, he would have made it clear from the beginning—as he will have to do from now on—that he was a newcomer in the hat business under his own name and that neither he nor his company had been or were in any way connected with the plaintiff.

Instead of doing this, by most artfully devised advertisements, worked out in collaboration with a lawyer, he succeeded in maintaining in the trade a state of what was to him a very advantageous uncertainty as to his relation to the plaintiff and in giving thereby a background for the dealer misrepresentations above mentioned.

I think that the fact that he worked out such advertising as we have seen, with his lawyer, indicated that he was plotting a course too far from the boundaries of candor. The authorities show that this strategy was wrong, and the event shows that it was futile; for so soon as the "Tradition" sign was produced at the trial and I read it, I at once realized that it was not a candid advertisement and that it would tend to confuse, instead of clarify, the situation, and that the act of the defendant Stephen L. Stetson Company, Ltd., in using that sign was not in accordance with fair dealing in such circumstances as we have here.

4. As to the question of the relation between the two defendants, it seems to me an apt juridical analogue of the contract between them is the well-known so-called government form of time charter party. In that contract, which is very familiar in the admiralty branch of this court, the language of a lease is used, and it is agreed that the shipowner will let and the charterer will hire the ship for a certain term on periodic payments; but in it the shipowner operates the ship through its own master and crew and furnishes a carrying service for the charterer, allowing the charterer to ship cargoes of its choice on voyages within the charter limits. Such a contract is not a lease or demise of the

vessel, but is merely a contract by the owner to serve the charterer with her. Munson S. S. Line v. Glasgow Nav. Co., Ltd., 235 F. 64, 67 (C.C.A.2); Luckenbach v. Insular Line, 186 F. 327, 328 (C.C.A.2); The Volund, 181 F. 643, 666 (C.C.A.2); Dunlop S. S. Co., Ltd., v. Tweedie Trading Co., 178 F. 673, 674 (C.C.A.2); Clyde Commercial S. S. Co., Ltd., v. West India S. S. Co., 169 F. 275, 277 (C.C.A.2). Cf. Robins Dry Dock & Repair Co. v. Flint, 275 U.S. 303, 308, 48 S.Ct. 134, 72 L.Ed. 290.

So, here, what Hutt & Wasserman, Inc., really agree to do under the contract between it and the Stephen L. Stetson Company, Ltd., is (using its own servants) to furnish to the Stephen L. Stetson Company, Ltd., a manufacturing service for the latter's hats, being paid for such service in part by reimbursement of piecework and in part on the basis of commissions on gross sales.

5. I think, therefore, that the plaintiff has made out a clear case of unfair competition on the part of the Stephen L. Stetson Company, Ltd., and that Hutt & Wasserman, Inc., participated therein.

6. Accordingly, I hold:

(a) That the plaintiff John B. Stetson Company now is the sole and exclusive owner of the trade-mark "Stetson."

(b) That that trade-mark has not been infringed by the defendant.

(c) That through the use of the name "Stetson" by the plaintiff and its predecessors, said name has acquired a secondary meaning to the purchasing public as designating hats manufactured by the plaintiff and its predecessors long before the defendant Stephen L. Stetson Company, Ltd., began to use the name "Stephen L. Stetson" on its hats.

(d) That the conduct of the defendant Stephen L. Stetson Company, Ltd., in using, without clearly differentiating itself from the plaintiff, the name "Stephen L. Stetson" on its products in connection with its distribution constitutes as against the plaintiff unfair competition in trade and has caused injury to the plaintiff.

(e) That the contract of June 1, 1933, between the defendant Stephen L. Stetson Company, Ltd., and the defendant Hutt & Wasserman, Inc., is a service contract only and not a lease.

(f) That the defendant Hutt & Wasserman, Inc., has participated in the unfair competition aforesaid and consequent injury to the plaintiff by attaching, in pursuance of said service contract, to the hats marketed by the defendant Stephen L. Stetson Company, Ltd., linings, sweatbands, labels, and tickets designating the hats as "Stephen L. Stetson" hats, and by affixing to the sweatbands of the hats the "Certificate" sign above referred to in the findings of fact.

(g) That although the true name of the president of the defendant Stephen L. Stetson Company, Ltd., is Stephen L. Stetson, neither he nor the said defendant had any right to use the name "Stetson"—whether or not prefixed by his Christian name and initials—upon the linings, sweatbands, labels, or otherwise, on its hats or upon hat boxes containing its hats, unless at the same time and in the same place they showed that they were not connected in any way with the plaintiff and thus clearly created a differentiation between the plaintiff's product and the product of the said defendant Stephen L. Stetson Company, Ltd.

(h) That the plaintiff was not guilty of laches precluding it from maintaining this suit.

(i) That the plaintiff is entitled to an injunction against the defendants and each of them, in the form hereinafter outlined restraining the continuance of the said unfair competition and to an adjudication of its damages resulting therefrom and for the recovery of any profits which the defendants may have made by reason thereof.

(j) That, consequently, the plaintiff may now have an interlocutory decree.

Supplemental Opinion.

Since my opinion, dated March 4, 1936, was filed herein on March 5, 1936, the question of the form of the interlocutory decree as therein outlined has been the subject of further argument in which counsel for all parties have participated, and, as a result of this argument, I am making certain modifications in the remedy prescribed by the opinion aforesaid.

As a consequence of these modifications, sections VII and VIII—those parts of the original opinion which cover the form of the interlocutory decree and the final decree—are withdrawn, and in place thereof the following is substituted:

VII. The interlocutory decree to be granted herein must contain an order providing that the opinion of March 4, 1936,

filed March 5, 1936, as hereby amended by this supplementary opinion be deemed to be the findings of fact and conclusions of law of this court in this cause, and must require, inter alia:

(a) That the injunction prayed in respect of the alleged infringement of trademark be and it hereby is in all respects, denied without costs.

(b) That the defendants and each of them and their officers, agents, and servants, be and they hereby are perpetually enjoined from any unfair competition with the plaintiff by the advertising which I have condemned, or otherwise.

(c) That the defendant Stephen L. Stetson Company, Ltd., its officers, agents, and servants, be and they hereby are perpetually enjoined from using in any form whatever, in connection with the advertising of its products, the word "Stetson" unless accompanied by one of the "Notices of Differentiation" hereinafter provided for.

(d) That neither of the defendants shall use the word "Stetson" alone or as part of the name of the defendant Stephen L. Stetson Company, Ltd., on any of their products whether a hat or cap, linings or labels thereof, or on the boxes in which the said hats or caps are packed, or otherwise, in any way except when accompanied by the following Notice of Differentiation:

Stephen L. Stetson
New York
By
Stephen L. Stetson Co., Ltd.
Incorporated 1933
NEVER CONNECTED IN ANY WAY
With
John B. Stetson Company
Or Predecessors
Hat Makers in Philadelphia
Since 1865

(e) That the line in the foregoing Notice of Differentiation containing the dividing words *"Never Connected In Any Way"* shall be printed in letters of substantially larger and bolder type than the matter above and below it; and that the matter below the said dividing words shall be clearly printed in type of the same size and design, shall be arranged in similar fashion and shall be of the same legibility and color as the matter shown above it, *except* that when this Notice of Differentiation is used on linings or labels inside the hats or caps of the Stephen L. Stetson Company, Ltd.,

the name "Stephen L. Stetson" at the top of the said Notice of Differentiation may, if desired, be printed curved convexly upwards immediately adjacent to the other part of the Notice, and may be printed in letters of the same size and boldness as the said dividing words.

An approved form of this Notice of Differentiation is hereto annexed as "Schedule A" hereof.

(f) That on all sweatbands used by the defendants in any of its products and in its display and other advertising, there shall be a Notice of Differentiation as follows:

Stephen L. Stetson Co., Ltd.
New York
Incorporated 1933
NEVER CONNECTED IN ANY WAY
With
John B. Stetson Company
Or Its Predecessors
Hat Makers in Philadelphia
Since 1865

An approved form of this Notice of Differentiation is hereto annexed as "Schedule B" hereof.

(g) That the defendants shall not use any advertising for the hats of Stephen L. Stetson Company, Ltd., which does not contain one or other of the Notices of Differentiation hereby above prescribed for use on its products and their containers and on its display advertisements.

(h) That the defendant Stephen L. Stetson Company, Ltd., shall, so far as it can do so by the fullest exercise of its legal rights, recapture from its dealer customers and secure the return to it of all the "Tradition" signs and all the "Certificate" labels hereinabove mentioned and all the so-called "Block" signs and "Illuminated" signs of the kind exhibited at the trial, and all other display advertisements of the said defendant now in the hands of its dealer customers, and that when the said signs, certificates, labels, and other display advertisements or any of them are returned the said defendant shall surrender them to the marshal for this district to be destroyed, in order that they may not again get into the hat trade.

(i) That in any future display advertisements of the products of the defendant Stephen L. Stetson Company, Ltd., the prescribed Notice of Differentiation must be so printed on the face of the advertisement as to be reasonably legible at a distance of

five feet, and must be placed in such a position on said advertisements as to make the Notice of Differentiation always visible when the name "Stephen L. Stetson" is visible, and to render it as nearly as may be impossible for dealer customers of the said defendant, by the use of hats, mufflers, or other goods, to cover the Notice of Differentiation hereby prescribed, unless they also cover the name "Stephen L. Stetson."

(j) That, for the further disinfection of the present situation as I have found it herein, the defendant Stephen L. Stetson Company, Ltd., must, within ten days after the filing of the interlocutory decree, write and mail, by first-class mail in a properly stamped and addressed envelope, to each of its *present* dealer customers— and hereafter to all its *future* dealer customers, so soon as they are acquired—a letter instructing each of them that they must not advertise or represent as "Stetson Hats" the hats of the Stephen L. Stetson Company, Ltd., which they offer for sale or sell, but must explain in their advertising and orally to their retail customers, and must instruct their clerks and salesmen to say that the hats marked "Stephen L. Stetson" come from the Stephen L. Stetson Company, Ltd., of New York, and not from John B. Stetson Company, of Philadelphia, and that Stephen L. Stetson Company, Ltd., was never in any way connected with the latter.

(k) That after this letter is written and mailed as herein prescribed, one of the officers of Stephen L. Stetson Company, Ltd., must (1) make an affidavit stating that it has complied with the preceding provision of the decree, showing the date on which the letter thereby prescribed was mailed, and annexing to said affidavit a true copy of the letter which it has sent out to its dealer customers in pursuance thereof, and (2) serve a copy of said affidavit with the letter annexed thereto on the attorneys for the plaintiff, and file in the office of the clerk of this court the original affidavit with admission from the plaintiff's attorneys of such service.

(1) That there be a reference herein to Wallace H. Martin, Esq., of the firm of Nims & Verdi, of 60 East Forty-Second Street, New York City, as special master, to determine any profits made by the defendants and any damages which may have been suffered by the plaintiff by reason of the defendants' acts of unfair competition which I have found as above indicated.

VIII. The final decree herein will also carry—

(1) A provision for costs, awarding against the defendants to the plaintiff its taxable costs and disbursements including the costs and disbursements of the reference, which must all be taxed before the decree is presented for signature, and

■ (2) Inasmuch as the objective of the court in causes of this kind is to work out a modus vivendi under which the parties may engage in fair competition with each other, a provision that either party may have the right to apply to the court at the foot of the decree at any time after a period of six months from the date of the entry thereof has elapsed—on proper notice and on such proof as the court may require—for a modification of the provisions of the injunction contained in the decree if, in the course of its operation during the said period of six months, said provisions are claimed not to have proved to be commercially workable. Cf. United States v. Swift & Co., 286 U.S. 106, 114, 115, 52 S.Ct. 460, 76 L.Ed. 999. And

(3) To effectuate this, a provision that the court will retain jurisdiction of the cause for said purpose.

Unless notice of settlement be waived, both decrees may be settled on two days' notice.

## SCHEDULE A

### NOTICE OF DIFFERENTIATION

*approved for*

#### Linings and Labels in Hats

STEPHEN L. STETSON
HATS
NEW YORK
BY
STEPHEN L. STETSON CO. LTD
INCORPORATED 1933
NEVER CONNECTED IN ANY WAY
WITH
JOHN B. STETSON COMPANY
OR PREDECESSORS
HAT MAKERS IN PHILADELPHIA
SINCE 1865

## SCHEDULE B

### NOTICE OF DIFFERENTIATION

*approved for*

#### Sweat Bands, and Display and Other Advertising

STEPHEN L. STETSON CO., LTD.
INCORPORATED 1933
NEVER CONNECTED IN ANY WAY
WITH
JOHN B. STETSON COMPANY
OR PREDECESSORS
HAT MAKERS IN PHILADELPHIA
SINCE 1865